receive the respondents as tenants during her lifetime, under an agreement made with a view to their becoming such. Upon the evidence, however, we, must hold that the dismissal was proper; there being no sufficient proof that the relation of landlord and tenant existed, and the accuracy of the reasoning which led to the correct result is not a substantial question upon this appeal. According to the testimony of the appellant, the arrangement between the parties was that the respondents (her daughter and the latter's husband) should make the premises their home, and should take it upon themselves to board her (appellant), and make necessary repairs, this to continue during her pleasure. The respondents' evidence was to the effect that no such agreement was ever made, that they never agreed to board the appellant, and that they had taken up their abode in the house pursuant to the appellant's assurance that it should always be their home while they lived. Taking the appellant's evidence as proof of the facts, no case of tenancy was made out. In Matthews v. Matthews, 49 Hun, 346, 2 N. Y. Supp. 121, the nature of such an arrangement as this was considered, and it was held that the promise to board the owner (a relative) was not an agreement to pay rent, or to make return for use and occupation as upon a leasing, within the reasonable intention of the parties. The further point in that case, touching the promise of a conveyance or devise as additional consideration, does not afford a ground of distinction. It is quite apparent from the reasoning employed in the opinion that the nature of the occupancy and of the duties assumed by the alleged tenants afforded the main ground for the conclusion that there was no intention to create the relation of landlord and tenant.

The final order must be affirmed, with costs.

---

(61 App. Div. 35.)

### KELLOGG et al. v. LEHIGH VAL. R. CO. et al.

(Supreme Court, Appellate Division, Fourth Department. April 30, 1901.)

1. UNLAWFUL BUSINESS COMBINATION—BUSINESS CONSPIRACY—GRAIN ELEVATORS —PLEADING.

A grain elevator firm sued an elevator association and certain railroad companies, alleging that they had entered into an unlawful business combination and conspiracy to prevent the partnership from running its elevator. Plaintiff averred that its elevator was well located, capable of handling 20,000,000 bushels of grain each season, and stated the customary charges for transshipping and storing grain; that by the agreement between defendants the elevator association was to elevate all grain cargoes forwarded by the railroads, utilizing for storage any or all elevators "comprising what are known as the 'facilities of the port' that have rail connection with the rail company, and first selecting, as far as possible, the elevators designated by the railroad." The elevator association agreed to accept as compensation one-half cent per bushel on all grain arriving at the port during the lake season, and carried from there by the rail company, and compensation was to be based on the total lake grain carried by the railroad. The complaint charged that in pursuance of such agreement the railroad refused to carry grain sent through plaintiff's elevator unless the shipper paid them an additional half cent

per bushel. *Held*, that the complaint was sufficient to allow proof that the agreement was entered into as an unlawful combination against plaintiff, and was not demurrable.

2. SAME—DAMAGES.

Plaintiff having further alleged that two certain shippers had been prevented from shipping a certain amount of grain through plaintiff's elevator by reason of the agreement, there was a sufficient averment of damages.

Appeal from special term, Erie county.

Action by Spencer Kellogg and Spencer Kellogg, Jr., against the Lehigh Valley Railroad Company and others. From a judgment overruling a demurrer to the complaint, defendants appeal. Affirmed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

James McC. Mitchell, for appellants.
George L. Lewis, for respondents.

SPRING, J. This action was brought July 9, 1900, and charges a conspiracy on the part of the defendants to prevent the plaintiffs from operating an elevator owned by them in the city of Buffalo. The complaint is demurred to on the ground that it does not state facts sufficient to constitute a cause of action. An analysis of the complaint shows the following allegations: That the plaintiffs are copartners operating the Kellogg Elevator in the city of Buffalo. That grain is received from vessels, stored in the elevator, and transshipped to cars or canal boats, and that the plaintiffs receive a compensation therefor. That the defendant Sowerby is president of the Western Elevating Association, which is a joint-stock association composed of 20 members. The incorporation and organization of the defendant railroad companies, which are common carriers, carrying grain from the elevators for hire, is set out in detail. That the legal rate for elevating and transshipping grain in Buffalo is five-eighths of one cent per bushel, including 10 days' storage, but the prevailing rate which has been charged and which was in vogue at the time the action was brought was one-half cent per bushel. That the established rate of the defendant railroad companies for transporting grain from Buffalo to New York, Philadelphia, and Boston is $2\frac{1}{4}$ cents per bushel for corn, and $2\frac{1}{2}$ cents per bushel for wheat. That the Kellogg Elevator is well located, with a capacity for receiving and transshipping 20,000,00 bushels of grain each season. That, in addition to the one-half cent per bushel for transshipment, each elevator receives $1.20 per 1,000 bushels for the use of the steam shovels, and the Kellogg Elevator is equipped with these. That the customary charge for storage after 10 days is one-fourth cent per bushel for each 10 days until the close of navigation, until two cents per bushel has been earned therefor, then the storage is free of charge until the opening of navigation the following year. The agreement between the Lehigh Valley Railroad Company and the Western Elevating Association is set out in full, and is identical with one which is claimed to have been made with each of the other defendant railroad companies. The

agreement provides that its object is to secure the prompt unloading of lake vessels at Buffalo, the securing of uniform rates, the avoidance of ,"demurrage to vessels and costly blockades of cars, with resulting delays to grain in transit"; that the elevating association is "to promptly elevate all grain cargoes to be forwarded by the railroad companies," to store said grain for not exceeding ten days, to load it, "utilizing for these purposes   *   *   *   any or all of the elevators comprising what are known as the 'facilities of the port' that have rail connection with the rail company, and first selecting, so far as the elevator association may find reasonably possible, the elevators. designated by the rail company as those it prefers." The second subdivision of this agreement is as follows:

"The rail company agrees to pay to the elevator association, and the elevator association agrees to accept, for services rendered hereunder, one-half cent per bushel upon all lake grain arriving at Buffalo in the lake season of 1900, and carried from Buffalo by the rail company; payment to be made on all said grain actually elevated and handled by or under the direction of said elevator association or otherwise. It is understood and agreed that the elevator association is only willing to undertake the prompt discharge of vessels herein called for, and to assume the consequent obligation to make the elevator facilities of the port of Buffalo available for that service upon being assured that said elevator association will receive compensation based upon the total lake grain carried by the rail company as aforesaid."

The complaint charges that such agreement and the kindred agreements with the other companies "were entered into as a part of an unlawful combination and conspiracy to injure these plaintiffs, and prevent them from doing business as above set out"; that in pursuance of such unlawful combination the railroads refused to carry grain for shippers, who sent it through the plaintiffs' elevator, except on the condition that an additional charge of one-half cent per bushel was paid by said shipper to said railroad companies; that such agreements and refusals were unlawful, and made for the purpose of injuring these plaintiffs, and preventing them from doing business at their said elevator, and for the purpose of advancing the interests of said Western Elevating Association, and the interest of said defendant railroads, who either own or are interested in certain elevators in said associations. The names of two firms are given who had arranged to use the elevator of the plaintiffs, and were prevented from so doing "by such unlawful combination and conspiracy," and the general statement is made that many shippers of grain "were hindered and delayed from sending their grain through the Kellogg Elevator by reason of said unlawful combination and conspiracy; and, further, plaintiffs have been prevented and will be prevented from elevating many million bushels of grain, and from receiving the elevator charges, the shovel and storage charges, as above set forth, to their damage of $100,000."

The counsel for the defendant urges that no fact is alleged to give support to the sweeping generalization of an unlawful combination, and hence no issuable fact is stated, relying upon Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263, and Kittinger v. Traction Co., 160 N. Y. 377, 54 N. E. 1081. If there was nothing to sustain the charge

of conspiracy except the bare allegation that it was an unlawful combination, it would be a conclusion, and within the counsel's criticism. But here the preference provided for in the agreement, and the construction which, under certain circumstances, may possibly be given to it, aid in some degree to support the charge. It is also further averred in the complaint that the combination worked an unlawful discrimination against the plaintiffs, because the railroad companies refused to carry grain received through their elevator, except upon the condition that the shippers should pay one-half cent per bushel as an additional charge, and that this discrimination was in pursuance of an unlawful combination and conspiracy, and was one of the inducements to the agreement; that the effect of this extra compensation was an embargo on the use of the plaintiffs' elevator; that shippers naturally would not pay plaintiffs one-half cent per bushel for the privilege of using their elevator. There is, accordingly, the general charge sustained in a measure as above stated, and its performance which it is claimed was contemplated at its inception, and which was injurious to plaintiffs. The respective counsel have given much consideration to the real import of this agreement. Its construction, whether legal or void, may be vital to the final determination of the rights of the parties to this action; but that may be controlled largely by outside circumstances and extrinsic proof (Lough v. Outerbridge, 143 N. Y. 271, 38 N. E. 292, 25 L. R. A. 674), and we do not deem it wise at this time to discuss the meaning or effect to be given to this agreement, and this is especially true as the charges of conspiracy in the complaint are not deduced solely from what appears upon the face of the contract, but embrace extraneous matters flowing from its operation. We therefore simply decide that the complaint, with its inferences and charges, contains sufficient to enable the plaintiffs to give proof in support of the charge that the agreement was entered into to accomplish an unlawful combination against the plaintiffs.

The defendants contend that no damages are alleged. The complaint does allege the prevailing or customary rate for storing or shipping grain in elevators, and that the plaintiffs lost customers by reason of the agreement, and, except for it, it would have handled a large amount of the grain, giving in the two instances named about 10,000,000 bushels.

The interlocutory judgment is affirmed, with costs to the respondents, with leave to the defendant to withdraw its demurrer and answer upon payment of the costs. All concur.